UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHARLES WATSON,

                                            Plaintiff,

**REPORT and RECOMMENDATION**

v.

08-CV-00960(A)(M)

M.D. LESTER N. WRIGHT, et al.,

                                            Defendants.

_____

        This case was referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings, including preparation of a report and recommendation on dispositive motions [36].[1] Before me is plaintiff's motion for a preliminary injunction [77].[2] For the following reasons, I recommend that the motion be denied.

**BACKGROUND**

        Plaintiff, an inmate, commenced this action *pro se* pursuant to 42 U.S.C. §1983, alleging, *inter alia*, that defendants have been deliberately indifferent to his medical needs while incarcerated at the Lakeview and Attica Correctional Facilities. Second amended complaint [45]. Plaintiff alleges that upon his transfer to Lakeview, his medications were discontinued. Second amended complaint [45], ¶¶15-23. Plaintiff seeks, *inter alia*, an injunction to prohibit his medications from being summarily discontinued upon transfer to a different correctional facility.

---

    [1]      Bracketed references are to the CM/ECF docket entries.

    [2]      Although plaintiff's motion also sought an expedited hearing, he later requested "that the request for an expedited hearing be withdrawn as academic". Plaintiff's October 31, 2009 correspondence [87], p. 1.

Id., "Wherefore" clause, ¶A(1). On February 24, 2009 plaintiff was transferred from Attica to the Green Haven Correctional Facility. Bernstein Declaration [55], ¶4.

While incarcerated at Green Haven, plaintiff moved for a preliminary injunction requiring defendant Lester Wright, M.D., New York State Department of Correctional Services ("DOCS") Chief Medical Director, and non-party Frederick Bernstein, M.D., Green Haven's Health Services Director, to maintain his prescriptions, to have him treated by a gastroenterologist and neurologist, to order an endoscopy and liver biopsy, and to stop the disruption of his medical treatment if, and when, he is transferred to another facility [50]. Unlike the current motion, "that motion did not address the practice and policy of DOCS to discontinue prescriptions upon the transfer of a prisoner". Plaintiff's affidavit [77], p. 3. I denied that motion by Report, Recommendation and Order dated June 8, 2009 [70], which was adopted by Judge Arcara on July 28, 2009 [74].

On August 4, 2009 plaintiff was transferred to Five Points Correctional Facility. Zimmerman declaration [82], Ex. B. He alleges that his prescriptions were again discontinued upon his arrival at Five Points pursuant to DOCS' policy. Plaintiff's affidavit [77], ¶5. Therefore, he moves for a preliminary injunction directing defendant Wright to "(1) stop the practice and policy of interrupting the Plaintiff's medications upon his transfer from DOCS facility to DOCS facility; (2) have Plaintiff seen by a hepatologist". Id., p. 4.

Shortly after plaintiff filed this motion, he was transferred to Clinton Correctional Facility. Zimmerman declaration [82], Ex. B.

## ANALYSIS

**A.      Preliminary Injunction Standard**

A preliminary injunction "is an extraordinary remedy and should not be routinely granted." Patton v. Dole, 806 F. 2d 24, 28 (2d Cir. 1986). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." Fisher v. Goord, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (Arcara, J.).

"When seeking a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme the moving party must show: (1) it will suffer irreparable harm absent the injunction and (2) a likelihood of success on the merits . . . . However, where, as here, the injunction sought will alter rather than maintain the status quo, the movant must show clear or substantial likelihood of success . . . . As a final consideration, whenever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." Rodriguez ex rel. Rodriguez v. DeBuono, 175 F. 3d 227, 233 (2d Cir. 1999).

The Prison Litigation Reform Act ("PLRA"), 18 U.S.C. §3626(a)(2), requires that "preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct the harm."

**B.     Irreparable Harm**

"To establish irreparable harm in the context of a medical claim, plaintiff must show that he has a medical condition which is likely to become significantly worse without some definite course of treatment." Burgess v. Goord, 2005 WL 1458236,** 2 -3  (N.D.N.Y. 2005). "Generally, an alleged violation of constitutional rights, such as those encompassed by the Eighth Amendment, creates a presumption of irreparable harm." McKenna v. Wright, 2002 WL 338375, *4 (S.D.N.Y. 2002).  "However, since the movant must show that the alleged irreparable harm is imminent, and not remote or speculative, we cannot rest a finding of irreparable harm solely on past conduct, even where a plaintiff has alleged that such conduct violated the Eighth Amendment." Id.

Here, plaintiff concedes that "since the filing of this suit, [he] has been transferred two times. Both times the Plaintiff's prescriptions were discontinued. The critical prescriptions were renewed within a couple of weeks of arrival at the new facility." Plaintiff's affidavit [77], p. 2. Therefore, plaintiff has failed to establish irreparable harm from DOCS' medical prescription policy, as it is based upon past conduct and he has offered nothing to suggest that a further transfer is imminent.[3]

Plaintiff also requests to be seen by a hepatologist to resolve contradictory test results between a Fibrosure blood test that indicates that he suffers from cirrhosis, and a subsequent liver biopsy that indicates that his liver has not deteriorated to this stage. Plaintiff's

---

    [3]    Plaintiff initially alleged that a further transfer was imminent because the New York State Supreme Court, Dutchess County, directed DOCS to house him in a single cell, but Five Points is a double bunk facility.  Plaintiff's memorandum of law, p. 7, Ex. A. There is nothing in the record to establish whether or not Clinton is a double bunk facility.

reply [88], p. 5. According to plaintiff, such an evaluation will give plaintiff a definitive diagnosis and "indicate the direction of the Plaintiff's treatment". Id., p. 6. Given defendants' concession that plaintiff' has a "serious [liver] condition", Lee declaration [86], ¶10, I find that the ongoing treatment of his liver condition raises a presumption of irreparable harm.

C.    **Likelihood of Success on the Merits**

The "deliberate indifference" standard consists of both objective and subjective components. Hathaway v. Coughlin, 37 F. 3d 63, 66 (2d Cir. 1994), cert. denied, 513 U.S. 1154 (1995). Under the *objective* component, the alleged medical need must be "sufficiently serious." Id. A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Id. "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Chance v. Armstrong, 143 F. 3d 698, 702 (2d Cir. 1998). "The medical condition does not have to occur immediately; it suffices if the condition presents itself 'in the next week or month or year.'" Moore v. McGinnis, 2004 WL 2958471, *6 (W.D.N.Y. 2004) (Siragusa, J.).

To satisfy the *subjective* component, plaintiff must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving him of adequate medical treatment. Hathaway v. Coughlin, 99 F. 3d 550, 553 (2d Cir. 1996). "The subjective element of deliberate indifference entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. *See also* Hernandez v. Keane, 341 F. 3d 137, 144 (2d Cir. 2003), cert. denied, 543

U.S. 1093 (2005) (likening the necessary state of mind to "the equivalent of criminal recklessness"). In order to be found "sufficiently culpable", the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference". Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Defendants concede that an April 2009 Fibrosure blood test revealed that plaintiff has "stage IV cirrhosis, which is a serious condition", and that a July 2009 liver biopsy "indicated grade II, stage II liver disease." Lee declaration [86], ¶¶10 and 11. Thus, I find that plaintiff's liver ailment constitutes a serious medical condition.

Plaintiff argues that he needs to be seen by a hepatologist based upon the contradictory results of his April 2009 Fibrosure blood test, which indicated that he suffers from stage IV cirrhosis, and that of a July 2009 liver biopsy, which indicated grade II, stage II fibrosis. Plaintiff's reply [88], p. 5.

Kang Lee, M.D., a physician at Clinton, explains that any potential discrepancy may be a result of the fact that a biopsy "is not necessarily of the condition of the entire organ", whereas a Fibrosure blood test "is a measure of overall functioning of the liver". Lee declaration [86], ¶13. In any event, "there is no recognized Board Certification for hepatology in New York, and the treatment of liver disease falls under the area of gastroenterology". Id. ¶17. Plaintiff has been seen by a gastroenterologists in the past, and Dr. Lee will request a referral in the future, if appropriate. Id., ¶18. However, at this time plaintiff is "not showing any symptoms of

liver disease, and has no active Hepatitis", and there is no further available treatment to control his hepatitis. Lee declaration [86], ¶¶15 and 16.[4]

Given Dr. Lee's representations, I find that defendants' failure to have plaintiff evaluated by a hepatologist does not amount to deliberate indifference. I likewise find that plaintiff has failed to establish that defendants have otherwise been deliberately indifferent to his liver condition. Blood tests were performed on plaintiff on September 3, 2009, and at that time, "his alpha-fetoprotein tests were within normal limits, as was his alanine aminotransferase ("ALT")" indicating normal liver functioning. Lee declaration [86], ¶16. According to Dr. Lee, "pursuant to accepted medical protocol, we will continue to monitor his blood levels every three (3) months". Id.

Plaintiff responds that "ALT levels are not recognized by experts in the field as absolute indication of inflammatory activity". Plaintiff's reply [88], p. 6. In support of this assertion, plaintiff relies on a Preliminary Draft Statement of the National Institutes of Health Consensus Development Conference Statement, which states in relevant part that "[t]esting for serum ALT levels in the most inexpensive and noninvasive means of assessing disease activity. However, a single determination of ALT levels gives limited information about the severity of the underlying liver disease . . . . Serial determinations of ALT levels over time may provide a

---

[4] Plaintiff requests that I order "an affidavit from [Robert Antonelle, M.D.] who has performed most of the procedures on the Plaintiff. His insight would be invaluable." Plaintiff's Reply [88], p. 7. Although I may appoint an expert (*see* Fed. R. Evid. 706), I see no basis for doing so at this time.

batters means of assessing liver injury, but the accuracy of this approach has not been shown". Id., Ex. B.[5]

It is evident from the medical literature provided by plaintiff that testing ALT levels may not be the optimal way to measure liver functioning. However, the literature fails to establish that Dr. Lee's approach of testing plaintiff's ALT levels every three months is baseless. "Plaintiff presents insufficient evidence, at this time, to suggest that the monitoring approach of DOCS physicians is inadequate. Courts are not well suited to micromanaging prisoners' healthcare and this Court will not accept plaintiff's invitation to do so." Dichiara v. Pataki, 2007 WL 749742, *3 n.1 (E.D.N.Y. 2007).

At most, plaintiff's claims amount to a disagreement about the care he is receiving for his liver, which is insufficient to establish an Eighth Amendment violation. "The Constitution does not require that an inmate receive a particular course of treatment, or that an inmate see a requested specialist." Tafari v. Stein, 2009 WL 331378, *7 (W.D.N.Y. 2009) (Scott, M.J.). Thus, "courts have repeatedly held that disagreements over treatment do not rise to the level of a Constitutional violation." Graham v. Gibson, 2007 WL 3541613, *5 (W.D.N.Y. 2007) (Siragusa, J.). "Determinations made by medical providers within their discretion are given a presumption of correctness when it concerns the care and safety of patients." Mendoza v. McGinnis, 2008 WL 4239760, *11 (N.D.N.Y. 2008).

---

[5] He also relies on an excerpt from Dr. Melissa Palmer's Guide to Hepatitis and Liver Disease, which states in relevant part that "elevations of [ALT] occur due to so may causes that they give the doctor only a vague clue of the diagnosis. . . . Additional testing is required in order to determine more precisely what is wrong with the liver." However, Dr. Lee is not using plaintiff's ALT levels to diagnosis his condition. Rather, she is using it to determine his liver functioning.

-8-

With respect to plaintiff's challenge to DOCS' prescription policy, plaintiff argues that "the policy and regulation of discontinuation of prescriptions evinces deliberate indifference. The plaintiff does not wake up in Greenhaven with certain chronic conditions and medications and by the time he gets to sleep at Five Points, he no longer has those conditions and is not in need of medications. Then he has to wait days and weeks to see a provider who might decide to represcribe. In the interim, the Plaintiff is forced to suffer the symptoms of those known conditions." Plaintiff's affidavit [77], p. 4. According to plaintiff, "there are three prescriptions that [he] deems critical to his everyday function. It is the vistaril which controls the extrahepatic manifestation of pruritus (itching). The prescription of prilosec is also critical to the Plaintiff's health and functioning. It is prescribed to control the Plaintiff's diagnosed gastritis and esophagitis. The third critical prescription is the medical therapeutic diet. That is prescribed as not to aggravate the Plaintiff's stomach and liver problems." Plaintiff's memorandum of law [77], pp. 2-3. "Without his medications [plaintiff] constantly itches and has difficulty sleeping. [He] also can not eat properly and suffers gastric discomfort and pain and nausea." Id., p. 4.

Plaintiff believes that "there is a simple solution to the problem. The solution is to continue the prescription upon transfer until such time a prisoner is seen and examined by a provider at the new institution." Id.

Defendants concede that "when an inmate arrives at a new facility, the medical provider at that facility must review and acknowledge their acceptance of current order by rewriting order for the inmate." Wameling declaration [85], ¶5. According to Karen M. Wameling, Pharm.D., the Pharmacy Director for DOCS, "the purpose of this practice is so the

prescriber can accept these patients into their practice, and is based upon the community model for primary care". Id. Moreover, "medications dispensed to DOCS inmates are provided by multiple pharmacies, both within the DOCS system and by outside contract vendors. Under New York law and regulation, prescriptions are owned by the individual pharmacies. If an inmate is transferred to a new facility, the only way for a prescription to follow the inmate is by pharmacist to pharmacist communication for one refill at a time." Id., ¶9. However, DOCS does maintain an exception for "keep on person medications", which "are allowed to be possessed by the unmate [*sic*] and should be released to the new inmate upon arrival to the new facility." Id., ¶7.

Defendants argue that plaintiff has failed to establish that his pruritus (a skin condition) and gastritis are serious medical conditions capable of producing death, degeneration, or extreme pain. Defendants' memorandum of law [83], p. 12. I agree. "Complaints of abdominal pain, vomiting, heartburn, constipation, body odor and extreme body heat did not constitute a serious medical need." Ross v. McGinnis, 2004 WL 1125177, *10 (W.D.N.Y. 2004) (Schroeder, M.J.); Benitez v. Ham, 2009 WL 3486379, *11 (N.D.N.Y. 2009) ("plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation").

Moreover, "when the basis for a prisoner's Eighth Amendment claim is a temporary *delay* or *interruption* in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." Ross, supra, 2004

WL 1125177 at *9 (emphasis in original). In this regard, plaintiff concedes that his "medications have been represcribed within two weeks to a month. There has been only one incident where the medications have not been represcribed." Plaintiff's affidavit [77], ¶7.

Considering the symptoms plaintiff experiences when he is deprived of his medications and the limited duration of these deprivations, I find that plaintiff has not established a sufficiently serious medical condition to support his Eighth Amendment claim arising from DOCS' prescription policy.

Even were I to assume that plaintiff's ailments constitute serious medical conditions, he must still establish that defendants "acted with a sufficiently culpable state of mind, *i.e.*, deliberate indifference. He must therefore show that prison officials intentionally denied, delayed access to, or intentionally interfered with prescribed treatment." Tafari, supra, 2009 WL 331378, at *6. Plaintiff has failed to establish this prong of his Eight Amendment claim. Although defendants concede that pursuant to DOCS' policy plaintiff's medical prescriptions are automatically discontinued when he is transferred to a new facility, as explained by Ms. Wameling, there is a legitimate explanation for DOCS' policy. In fact, plaintiff concedes that he "does not at this juncture of the proceedings in the case challenge or dispute the practice of review by the new provider". Plaintiff's reply [88], p. 3.

Despite DOCS' procedure of terminating his prescriptions upon arrival to a new facility, it is evident that plaintiff's medical conditions were not left unattended. Upon his arrival at Clinton on October 15, 2009, a medical evaluation of plaintiff was conducted by a registered nurse. Lee declaration [86], ¶4. Had the intake nurse determined that plaintiff needed urgent medical care, he would have been seen by a doctor within a short period time. Id., ¶5. However,

the intake nurse determined that there was nothing about plaintiff's condition that warranted urgent medical care. Id., ¶6  Plaintiff was then examined by Dr. Lee on October 23, 2009. On or before October 31, 2009, plaintiff was prescribed his medications. See Plaintiff's October 31, 2009 correspondence [87].

Under these circumstances, I do not find that plaintiff has established that defendants were deliberately indifferent to his medical condition.

## CONCLUSION

For these reasons, I recommend that plaintiff's motion for a preliminary injunction [77] be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by March 29, 2010 (applying the time frames set forth in Fed. R. Civ. P. 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985). Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules of Civil Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made

and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), may result in the district judge's refusal to consider the objection.

**SO ORDERED**

DATED: March 10, 2010

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge